**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank SOYKA, Defendant-Appellant.**

**No. 177, Docket 31583.**

United States Court of Appeals Second Circuit.

Argued Nov. 16, 1967.

Decided Jan. 18, 1968.

On Rehearing May 21, 1968, In Banc.

Joshua N. Koplovitz, New York City (Selig Lenefsky, New York City, on the brief), for defendant-appellant.

Frederick F. Greenman, Jr., Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., Pierre Leval and David M. Dorsen, Asst. U. S. Atty's, on the brief), for plaintiff-appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Frank Soyka, convicted after trial to the jury in the United States District Court for the Southern District of New York, Richard H. Levet, Judge, of possession of illegally imported narcotics knowing it to have been illegally imported, in violation of 21 U.S.C. §§ 173 and 174, appeals. We find error in the denial of a motion to suppress evidence obtained in a search of Soyka's apartment, and reverse and remand for dismissal of the indictment.

Following his indictment and plea of not guilty, Soyka moved to suppress evidence against him. After an evidentiary hearing, Judge Bryan in a memorandum opinion denied Soyka's Rule 41(e) motion to suppress as evidence the heroin hydrochloride seized at the time of his arrest. The motion was renewed at the outset of trial and at the close of the evidence, and was denied each time.

Appellant contends that the evidence seized at the time of his arrest should have been suppressed; that there was no evidence that appellant was in possession of the heroin hydrochloride seized in his apartment at the time of his arrest and that the charge to the jury on that

question was erroneous; and that his case was prejudiced by a suggestion made to the jury in the government's summation.

On June 17, 1965, Edward T. Guy, an agent of the Federal Bureau of Narcotics, received a telephone call at the Bureau's office. The caller told Agent Guy that Frank Soyka, residing at 264 West 19th Street in apartment 54, was obtaining large quantities of pure heroin and selling heroin in ounce and half-ounce quantities out of his apartment. He described Soyka as a white male, approximately thirty years of age, approximately six feet tall, weighing 200 pounds, with a glass eye and usually wearing a black three-quarter length leather jacket. In addition, he described apartment 54 as being situated to the right of the stairway as one approaches the fifth floor of the building, and as having a peephole and crossbar lock on the door and "gates" on all of the windows. The caller also told Agent Guy that Soyka had previously been arrested for possession of a gun and for attempted armed robbery, and that he "had a narcotic charge"; and that Soyka's registered telephone number had been "disconnected," replaced by another number of which the caller was not aware.

Agent Guy recognized the voice of the caller on the basis of previous telephone conversations with him. He did not know the caller's name, however, for the caller had always refused to identify himself. Guy testified that he had called twelve to fifteen times, that on three occasions his information had led to arrests, that on other occasions the caller's information had proved to be accurate, and that of the three arrests, two had resulted in convictions.

After the call, Agent Guy ascertained that Soyka had been arrested on the three charges described by the caller, and that Soyka's phone had been changed to an unlisted number. Guy also obtained a photograph of Soyka, which he showed to his fellow agent, Francis E. Waters, with whom he had been conferring about the case.

On June 18, 1965, Guy received another call from the same informant, who stated that Soyka at that time had a quantity of heroin in the cabinet in his kitchen. Agent Waters, who was on an extension telephone, told Guy to ask the informant whether or not Soyka had a dog in his apartment; Guy asked that question, and the response (as testified to by Waters) was: "yes, he did have a dog, but it was very small and nothing to worry about."

About an hour after this second call Agents Guy and Waters, together with Detective Egan of the New York City Police Narcotics Squad, went to 264 West 19th Street for the avowed purpose of verifying the location and description of Soyka's apartment preparatory to getting a search warrant. As to the purpose of Detective Egan's presence, Guy testified on cross examination: "We just felt that search warrants were easier to obtain in New York State courts than in the federal court, so we called Detective Egan."

Guy, Waters and Egan entered the apartment building and walked up the stairs, Guy and Egan in the lead and Waters about half a flight of stairs behind. They intended to walk past apartment 54 to observe its layout, then to continue to the roof, from which they could determine whether or not the apartment's windows had bars as the informant had said.

As Waters approached the fifth floor, the door to apartment 54 opened and Soyka (who matched the informant's description and the photograph which the agents had obtained) stepped out. Waters testified at the hearing: "Soyka * * * and I stood there facing each other, separated by maybe twenty feet. He looked at me and then jumped back toward the inner recess of the apartment. At that moment I jumped toward him and identified myself. I said, 'I am a federal agent and you are under arrest.' " At the trial, Waters testified that Soyka

"caused a startled, alarmed expression to come over his face."

Guy and Egan came back downstairs; the two agents and Egan accompanied Soyka to the interior of the apartment, where they found Mrs. Soyka, another woman, one or two children, and a dog. Waters began to search the kitchen, and found a tinfoil package containing 86% pure heroin inside a cabinet. At trial Waters testified that upon discovering the package, he said: "I've got it. Here it is. Let's give this place a real search now." Waters testified that Soyka then said: "That's it. You've got it. There's nothing else here. There's no sense in tearing the apartment apart." A further search was conducted, in which none of the usual items used in diluting heroin were found.

Appellant offered the testimony of his wife, a friend of theirs who was in the apartment at the time of the arrest, and his mother-in-law. Mrs. Soyka and her friend testified that the agents had pushed their way into the apartment with drawn guns. Mrs. Soyka testified that when Waters discovered the heroin and exclaimed that he had found it, her husband said nothing. Mrs. Soyka and her mother testified that Mrs. Soyka's brother had been staying in the Soyka apartment, and was an addict.

The only substantial issue on this appeal is whether or not the agents had reasonable grounds to believe that Soyka had violated or was violating the federal narcotics laws. If they had such reasonable grounds, they had authority under 26 U.S.C.A. § 7607 to arrest Soyka, and the accompanying search was lawful. This court has said that "In cases involving suspected narcotics violations, where evidence may easily and quickly be secreted or disposed of, the clear intendment of [this section] was to grant agents broad discretion in determining the appropriate time for arrest." United States v. Santiago, 327 F.2d 573, at 574 (2 Cir. 1964). Thus Agent Waters, faced with the choice of arresting Soyka or running the risk that he would destroy the evidence, was justified in arresting him *immediately* if he had reasonable grounds for arresting him at all.

The Supreme Court has said that "reasonable grounds" as used in 26 U.S.C.A. § 7607 and "probable cause" as used in the Fourth Amendment are "substantial equivalents of the same meaning." Draper v. United States, 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 (1959). If there was no probable cause for the arrest, the search of the apartment was of course illegal and the evidence should have been suppressed.

The fundamental basis for any finding of probable cause in this case must be the information supplied by the agents' anonymous informer. In Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court held that for a search warrant to issue upon information supplied by an informer, the magistrate issuing the warrant must be informed (1) of some of the underlying circumstances from which the informant concluded that the evidence [in that case, as in this, narcotics] was where he claimed it was, and (2) of some of the underlying circumstances from which the police concluded that the informer was credible. For all that appears on this record, the agents and Detective Egan could not have constitutionally obtained a warrant for the search of Soyka's apartment, because they were not aware of the underlying circumstances from which their anonymous informant concluded that the narcotics were in Soyka's kitchen cabinet. And under *Aguilar,* it would not have mattered (whatever they may have thought) whether they had gone into state or federal court to obtain a warrant.

■■ If the agents could not have obtained a search warrant because of failure to meet Fourth Amendment requirements of probable cause, then they could not have obtained a warrant for Soyka's arrest, either. See Beck v. State of Ohio, 379 U.S. 89, 96 n. 6, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). If the standards applicable in obtaining a search warrant

on informers' tips were not also applicable in obtaining an arrest warrant (or, *a fortiori*, in making an arrest without a warrant), the standards could of course easily be circumvented by the making of an arrest with an accompanying search.

The government seeks to avoid application of the *Aguilar* standards to this case. It first argues that the "wealth of detail" supplied by the informant made it clear that he must have been a close personal observer, citing "Cf. United States v. Desist, Docket No. 30894, 2 Cir., Oct. 13, 1967, slip op. at 3457 [384 F.2d 889]." In *Desist*, one of the questions at issue was whether or not a warrant authorizing seizure of a huge supply of heroin was defective. The defendants relied on *Aguilar*, and this court held that their reliance was misplaced for a number of reasons, one of them being that there was no question in the case of the credibility of an informant, since the affidavit submitted in obtaining the warrant was obviously derived chiefly from the personal knowledge of the affiant and his fellow agents. The opinion in *Desist* reaffirms by implication the principle that for probable cause to be based on information supplied by an *informant*, problems of credibility make it essential that something more than a "wealth of detail" be provided.

The "wealth of detail" supplied by the agents' informer in this case amounted to physical description of Soyka and his apartment, an accounting of Soyka's record, and the information that Soyka's telephone number had been changed. None of this detail could help in the slightest in explaining the circumstances from which the informant determined that the heroin was in the kitchen cabinet. For all that appears, he heard it from someone who knew somebody whose brother had bought heroin from Soyka—and that wouldn't be enough to show probable cause without some showing of the reliability of each of the chain of informants. The government cannot, of course, rely on what the search subsequent to the arrest turned up.

It must be remembered that although probable cause may be based on hearsay testimony, that testimony must be based on the personal observation of the absent witness.[1] This requirement is not met here, where the anonymous informant fails to give the basis of his claimed knowledge.

The government also argues that when information furnished by an informant is confirmed by the personal observations of investigating officers, there is probable cause established, citing Draper v. United States, 358 U.S. 307, 79 S.Ct. 329,

---

1. "The rule permitting reasonably substantiated hearsay testimony, Jones v. United States, supra. 362 U.S. at 257, 80 S.Ct. 725, 4 L.Ed.2d 697, to be weighed by a magistrate as having probative value has been confined to factual information. Thus, in Nathanson v. United States, 290 U.S. 41, 44, 54 S.Ct. 11, 78 L.Ed. 159 (1933), where the affiant stated that 'he has cause to suspect and does believe' that the liquors on which federal taxes were unpaid were 'within the premises of J. J. Nathanson,' the Supreme Court expressly held that this was insufficient to support a finding of probable cause:

'Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from *fact or circumstances* presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough.' (290 U.S. at 47, 54 S.Ct. at 13) (Emphasis added.)
See also Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). These cases exemplify the application of the historical rule that 'under the exceptions to the Hearsay rule the testimony of the witness deceased or absent must equally be based on personal observation. The testimony is admitted in spite of its not having been given on the stand subject to the test of cross-examination; but still it is testimony, and the person making the statements must have the means of knowledge expected normally of every witness,' Wigmore, Vol. II, p. 791, § 670, 'and must have actually observed the fact[s].' McCormick on Evidence, § 10, p. 19." United States v. Morin, 250 F.Supp. 507, 509–510 (D.Conn.1966).

3 L.Ed.2d 327 (1959). This argument raises the question of the extent to which the holding in *Draper* has been modified by that in *Aguilar*. *Draper* and similar cases, however, are in any case distinguishable from this case, for they all involved corroboration of a predicted course of conduct by the suspect in the carrying on of the narcotic traffic, so the extent to which *Aguilar* has modified them need not be spelled out.

The question was considered in Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966), cert. denied 386 U.S 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). In that case, a federal narcotics agent received a call from an informant whose voice he recognized and who told him that two men (whom he described in detail) had just boarded a bus to Washington, D. C., carrying narcotics. The information was relayed to agents in Washington, D. C., who went to the bus station, observed two men matching the descriptions given get off of the bus named by the informant, recognized one of them as a man who had been pointed out previously as a narcotics seller, and arrested them both. A search turned up a package of heroin on the appellant's person. The appellant relied on *Aguilar*, and the court's response was that this reliance ignored "the significant factual distinctions between the two situations; there the warrant was for the search of a *dwelling* and the warrant application recited naked conclusions * * *. Here, on the other hand, we are dealing with a street arrest based on reliable information which fixed the precise hour, the precise public place and the precise persons who would be found carrying illicit narcotics * * *." 358 F.2d at 836.

The Court noted the remarkable factual similarity between *Draper* and the case before it (*Draper* also involved an informer's tip that a described individual would arrive on a specified public conveyance—there a train—carrying narcotics), and held that *Aguilar* did not affect *Draper* in its application to inform-ers' tips resulting in street arrests such as the one before it.

The government here relies on *Smith*, arguing that the standards of *Draper* are applicable. But the arrest of Soyka, unlike the arrests of *Draper* and *Smith*, was not a street arrest. The government argues that the standards of *Draper* are applicable anyway, for four reasons: (1) "other information" supplied by the informant in the two conversations proved to be accurate, in that Soyka had the arrest record described and had changed his phone number; (2) the apartment was where the informant said it would be, and had the peephole and crossbar lock he reported; (3) the man who stepped out of the apartment door matched the informant's description; and (4) Soyka was alarmed and beat a hasty retreat into his apartment upon seeing Waters. A number of cases are cited in support of the government's contention that the standards of *Draper* are applicable. Only one of those cases involved circumstances at all similar to those in this case.

Draper v. United States, supra, and Smith v. United States, supra, both involved street arrests in which something which the informant had told the agents about the defendant's arrival at a certain place at a certain time. In United States v. Repetti, 364 F.2d 54 (2 Cir. 1966), again there was a street arrest; the arresting officers had been informed that the described defendant would be delivering heroin at a certain place at a certain time, and when he arrived to make the delivery he was arrested. The circumstances in United States v. Irby, 304 F.2d 280 (4 Cir.), cert. denied 371 U.S. 830, 83 S.Ct. 39, 9 L.Ed.2d 67 (1962), were very much like those in Smith v. United States, supra. The informant there described to federal narcotics agents a trip which the defendant would take to obtain narcotics, and narcotics agents in New York City observed the defendant, during the trip which the informant had said he would make, visiting a place frequented by narcotics violators. The agents ascertained that

defendant was making his trip under an assumed name.

United States v. Santiago, 327 F.2d 573 (2 Cir. 1964), also involved a street arrest. Agents were told that the defendant was selling narcotics; the information was corroborated by several reliable informers; the agents searched police records and found that the defendant had two prior narcotics convictions; and the agents had the defendant under surveillance for nine days, during which she met with a number of known narcotics addicts.

In United States v. Campos, 255 F. Supp. 853 (S.D.N.Y.1966), affirmed on opinion below, 362 F.2d 1011 (2 Cir.), cert. denied 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966), an informer had given narcotics agents a description of the defendant and had told them he could be found "in the general area of 136th Street and Broadway near the Oceanview Bar." The agents were also told that the defendant had a purchaser for the ten or twelve pounds of marijuana remaining in the defendant's possession. The agents found the defendant in the named vicinity, and maintained surveillance of him for several hours. Eventually he entered an apartment house, and shortly thereafter emerged carrying a large suitcase, whereupon the arrest took place. As in all of the cases just discussed, something about the defendant's pattern of operations was revealed by the informant.

The one case cited by the government involving circumstances somewhat similar to the case at bar is United States v. Nicholas, 319 F.2d 697 (2 Cir. 1963), cert. denied 375 U.S. 933, 84 S.Ct. 337, 11 L.Ed.2d 265. Narcotics agents proceeded to an apartment for the purpose of enlisting Nicholas' efforts in obtaining information relative to narcotics violations; they had received information from a paid informer that Nicholas and his common law wife were selling heroin at that apartment. This accorded with other information which the Bureau of Narcotics possessed, and Nicholas had a criminal record including three narcotics offenses. As the agents were about to knock on the door of the apartment, the door was opened by Nicholas' wife, who on learning their identity threw herself upon one of them and screamed, "police, police." The agents then entered the apartment, and one of them observed Nicholas shatter a window through which he threw a paper bag containing heroin. The bag was retrieved, and an ensuing search turned up marijuana; Nicholas' freedom in the apartment was restricted, and this was held to constitute an arrest. This court said: "In this case the agents were provided with information of sufficient specificity to authorize them under 26 U.S.C. § 7607(2) to make the arrest without a warrant and to thereafter make the accompanying search and seizure," citing Draper v. United States, supra, and two other cases in which the arresting officers had corroborating information as to the suspect's pattern of activities, etc. This court then went on to point out, however, that "The screaming and fracas at the door corroborated the agents' prior information * * *."

The four factors stressed by the government in this case cannot be said to amount to sufficient corroboration to give the agents probable cause to arrest Soyka. Certainly the physical description of Soyka and his apartment were not enough; to describe a person's pattern of activity and predict his arrival at a certain place at a certain time is one thing, but for the informant merely to tell the police where the suspect lives doesn't indicate anything about the informant's knowledge of illegal activity. So far as the arrest record and change of phone number are concerned, that information could have been ascertained by somebody who had no knowledge of Soyka's current activity. And Soyka's look of alarm and hasty retreat could not corroborate what the informant had told the agents. The record does not indicate that the agents were in uniform or wore badges; without the benefit of hindsight, it cannot be said that Soyka's action indicated anything except that he

did not want an encounter with whoever was outside his apartment door, and there are no indications that Soyka knew who Waters was before he retreated. The *Draper* line of cases is not applicable here, and there is no reason not to apply the requirements enunciated by the Supreme Court in *Aguilar*. If those requirements are *not* insisted on, then the policy of encouraging police to obtain search warrants will be undercut, for all narcotics agents need do if they are informed somebody with an arrest record including narcotics offenses is selling narcotics from his home is to confirm the arrest record, then wait outside the suspect's door until he emerges with an alarmed expression upon seeing someone lurking there, and arrest him straightway. And the question of the informer's credibility as to the suspect's *current pattern of activity* will only be answered with the benefit of hindsight.

The government argues that Agent Waters was faced with a split-second choice between arresting Soyka and allowing him to destroy whatever heroin he had in the apartment. That begs the question, which is whether or not there were reasonable grounds, or probable cause, for the arrest. The agents' discretion under 26 U.S.C. § 7607 in determining the proper time for arrest does not wipe out the requirement of probable cause, certainly. See United States v. Santiago, supra. If Waters had no reasonable grounds for thinking that there was heroin in the apartment to be destroyed, the government can hardly be heard to argue that arrest was justified because otherwise Soyka would have the opportunity to destroy the heroin in the apartment.

It is true that police arresting on the basis of an informant's information need not be apprised of the underlying circumstances from which the informant drew his conclusions, where independent circumstances, including the suspect's conduct, corroborate the information given. The rationale of the *Aguilar* requirement that police be apprised of underlying circumstances in search warrant cases is that in such cases there is no other way of determining whether or not the informer is acting from his personal knowledge as to *present* circumstances. In the *Draper* line of cases, the corroborating circumstances, as the courts have pointed out, have always tended to show the informant's reliability as to the suspect's *present* pattern of activity (e. g., he will be arriving on a certain train at a certain time). In such cases, there is no need for the police to know that the informer is acting on personal knowledge; circumstances show them, *before* the arrest, that he *must* have been so acting. [The other requirement of *Aguilar*—that the informer is a reliable informer, goes of course to his general reliability, and not to his personal knowledge of the suspect's current activity. That requirement was met here.]

Chief Judge Bazelon, dissenting in Smith v. United States, supra, expressed his view that *Aguilar did* modify *Draper*. But he was of the opinion that the facts known to the police in *Smith* were not sufficient to indicate that the informant had been following the course of Smith's conduct.

We need not consider Soyka's other claims of error,[2] since the arrest

---

**2.** Appellant also contends that the agents' entry into the apartment building was itself a violation of the Fourth Amendment, and urges reconsideration of the holdings in United States v. Conti, 361 F. 2d 153 (2 Cir. 1966); United States v. Miguel, 340 F.2d 812 (2 Cir.), cert. denied 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1965). There is no indication that the agents forced their way into the build-

ing, or that they were there for any purpose besides the avowed one of checking out the apartment's location and physical description. The argument is without merit.

Appellant argues that there was insufficient evidence for conviction, because there was no evidence that he was in possession of the heroin in the kitchen cabinet. But the jury was certainly free to

was without probable cause, the search in connection therewith illegal and the evidence should have been suppressed. Judgment reversed.

FRIENDLY, Circuit Judge (dissenting):

I concede *arguendo* that, under Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431 (1966), when the agents went to the apartment house, they were marginally short of enough information to obtain a valid search warrant, as they themselves recognized—although all would have been well had the informant uttered the magic phrase, "I have seen," which anyone except a judge would doubtless consider implicit in what he had said. Our question is the different one whether Agent Waters had reasonable cause for the arrest and incidental search. The question is different for two reasons: the existence of an important additional fact, Soyka's suspicious behavior at confrontation, cf. United States v. Heitner, 149 F.2d 105 (2 Cir. 1945), and the greater need for prompt action to prevent the destruction of evidence once a person possessing narcotics knows that arrest and seizure

may be imminent. While United States v. Nicholas, 319 F.2d 697 (2 Cir.), cert. denied, 375 U.S. 953, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963), was a somewhat stronger case for the Government, its principle is controlling here. Most citizens would have regarded Agent Waters as guilty of a gross dereliction of duty if he had meekly allowed Soyka to retreat into the apartment and destroy the narcotics which, by any ordinary standard of common sense, he had every reason to believe were there. To me it degrades the Fourth Amendment when as judges we condemn him for making an arrest that, as he reasonably believed, his duty as a federal officer compelled. The spectre of the consequences of a contrary decision conjured up by the majority is unreal; innocent persons emerging from their apartments do not normally jump back on encountering a single stranger in the hall.[1] Agent Waters did not have time to consult a set of the United States reports, and, as indicated by the fact that three federal judges have made the same supposed mistake, would not have benefited overmuch if he had. Rather he was obliged to make the best decision he could on the spot. While the point is doubtless foreclosed for us, I cannot refrain from adding, with all respect,

believe the agents' testimony that appellant said, "That's it. You've got it. There's nothing else * * *." And that would be enough to indicate possession. The alibi based on the presence of appellant's brother-in-law, an addict, is worthless in light of the fact that the heroin seized was 86% pure.

The jury was charged that if the narcotics were found in the apartment, and Soyka knew they were there, this would constitute constructive possession, and that Soyka's counsel had conceded this point. Appellant contends that no such concession was made. But counsel did say in summation: "If you believe the agents that Frank Soyka actually exhibited knowledge and said these words, 'That's all there is' * * * if you really believe that, then I say to you gentlemen, when our august judge concludes his charge, convict him where you sit, we need not go any further." And there were no exceptions to the charge. There was no error on this score.

Appellant's final contention is that the government's summation was unfair. But the remarks to which appellant points were obviously designed to point out that defense counsel's argument that the testimony as to Soyka's exclamation ["That's all there is", etc.] was a "concocted afterthought" was weakened by his failure to ask the agents whether or not they had mentioned this exclamation in their post-arrest reports.

1. While the majority thinks "it cannot be said that Soyka's action indicated anything except that he did not want an encounter with whoever was outside his apartment door," the drawing of inferences from the testimony is the business of the trial judges who see and hear the witnesses. Judge Bryan ruled that Soyka's behavior "lent color to the information which had been made available to the agents," and it can hardly be asserted that this was clearly erroneous.

that if Waters erred at all, the error was so minuscule and pardonable as to render the drastic sanction of exclusion, intended primarily as a deterrent to outrageous police conduct, see Linkletter v. Walker, 381 U.S. 618, 631–637, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), almost grotesquely inappropriate.

It is interesting to speculate how my brothers would dispose of a case precisely like this except that the information was that the occupant of Apartment 54 was purveying government secrets to a foreign power, as in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). I have too much regard for their good sense to believe they would hold on such facts that the arrest was invalid and a code book found in the apartment must be returned. But I should not crave the task of writing the opinion in light of today's decision, and we can hardly expect—indeed we should not want—law enforcement officers to indulge in what we tell them violates the Constitution. Apparent disfavor for certain felonies seems to be leading courts to elevate the standards for search and seizure to unrealistic levels and, without saying so, to move in the direction of the stricter standards governing arrests for misdemeanors. If decision were mine to make, I would not be at all averse to straightforward recognition that the gravity of the suspected crime and the utility of the police action for purposes other than securing a conviction are factors bearing on the validity of the search or arrest decision, or at least on application of the exclusionary rule. See ALI, Model Code of Pre-Arraignment Procedure, Tent. Draft No. 1, § 9.11 (March 1966). Such a course would seem peculiarly appropriate in cases arising under the Fourth Amendment since this bans only "unreasonable" searches and seizures, the main purpose of the exclusionary rule thereunder is deterrence, see Linkletter v. Walker, supra, and no majority of the Supreme Court has held that the Amendment compels that sanction, see Mapp v. Ohio, 367 U.S. 643, 661, 81 S.Ct. 1684, 6 L.Ed.

2d 1081 (1961) (concurring opinion of Mr. Justice Black). If my brothers' ruling could be confined to narcotics pushers like Aguilar and Soyka or gamblers like Riggan, I would hardly dissent. But that is not the received wisdom of today; at least in theory this decision would govern crimes of the greatest seriousness and cases where an arrest might lead to the recovery of stolen property or even a kidnapped child rather than of contraband.

I would sustain the rulings of the two able district judges denying suppression and affirm Soyka's thoroughly merited conviction.

### On Rehearing in Banc

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Upon the Government's petition asserting that the opinion of the panel majority had established an "unrealistic" and "unworkable" standard of probable cause that "will have a seriously damaging precedential effect on the entire range of the enforcement of the criminal laws," the court voted to reconsider this appeal *in banc*. Counsel were afforded an opportunity to file further briefs but elected to stand on the material already before us. The court has reached a conclusion on the legality of Soyka's arrest and the consequent search differing from the panel's. Agreeing with Judge Smith's disposition of Soyka's other points, pp. 450–451, fn. 2, we affirm the conviction.

The Government forcefully contends that the detailed information disclosed by the informant and the verification of much of this by the agents supplied the reasonable cause that would have been necessary for issuance of a search or an arrest warrant, quite apart from Soyka's behavior on encountering Agent Waters in the hallway. The general reliability of the informant being conceded, the issue would be whether there were sufficient "underlying circumstances" to war-

rant a conclusion that in this case he "was 'credible' or his information 'reliable,'" Aguilar v. State of Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L. Ed.2d 723 (1964). The Government stresses the informant's revelation of facts unlikely to have been knowable save as a result of personal observation—that Soyka was obtaining large amounts of heroin and selling it in ounce and half ounce quantities in Apartment 5A; that the windows were locked with gates, a fact normally available only to one who had seen them from the inside; that Soyka had recently changed his telephone number; and, on the informant's second call, "that Frank Soyka at the present time had a quantity of heroin in the cabinet in his kitchen . . . the remains of an eighth of a kilogram of heroin," and that there was a dog in the apartment—"a very small dog." While it is possible, as the panel majority suggests, that this and other information could have been heard by the informant "from someone who knew somebody whose brother had bought heroin from Soyka," p. 447 such an inference is exceedingly strained.

■■ Certainly the case for the validity of a search or arrest warrant obtained on what the agents had before going to the apartment would have been far better than in Aguilar v. State of Texas, supra, where there was nothing but an affidavit by the officers that they "have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law," 378 U.S. at 109, 84 S.Ct. at 1511, or in Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431 (1966), where the affidavit of probable cause stated, in merely conclusory terms, "Personal observation of the premises and information from sources believed by the police department to be reliable." 206 Va. 499, 144 S.E.2d 298, 299 n. 1 (1965). If the informant had used the phrase "I

have seen," Jones v. United States, 362 U.S. 257, 267–268 n. 2, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and McCray v. State of Illinois, 386 U.S. 300, 303–304, 87 S. Ct. 1056, 18 L.Ed.2d 62 (1967), would be clear authority for the validity of a warrant. Yet the district judges who denied Soyka's motion to suppress could fairly have considered this to be implicit in what the informant said. We have been wisely told that, in dealing with probable cause, we must depend on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), and that affidavits for warrants are not to be interpreted "in a hypertechnical, rather than a commonsense manner " in cases where the "circumstances are detailed" and there is "reason for crediting the source of the information * * * given." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

■ We are not, however, required to decide whether a magistrate or commissioner, told of all the Government here knew about Soyka, could not rationally have found this to be enough to justify the issuance of a warrant. A new set of facts was thrown on the scales when the agents' proper reconnaissance was interrupted by the appearance of Soyka who, seeing Agent Waters in the hall near his apartment, "jumped back toward the inner recess of the apartment." It is hardly usual, even in a Manhattan apartment building, for a hefty young male tenant to beat an alarmed retreat upon encountering another man in the hallway; rather, his conduct afforded impressive confirmation of what the agents had been told, see United States v. Heitner, 149 F.2d 105 (2 Cir. 1945). Finding that Soyka's physical appearance tallied precisely with the informant's description and that he acted as a narcotics seller normally would upon encountering law enforcement officers, Agent Waters had reason to conclude from this "cumulation of instances" that

the information about Soyka was right, whether it stemmed from the informant's personal observation or not. See United States v. White, 124 F.2d 181, 185 (2 Cir. 1941); United States v. Bottone, 365 F.2d 389, 392 (2 ·Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); United States v. DiBrizzi, 393 F.2d 642, 644 (2 Cir. 1968). All that the informant had said was reinforced by what Soyka did, and what Soyka did was colored by what the informant had said. Reading the Fourth Amendment as requiring a law enforcement officer, armed with the reasons for belief in guilt that Agent Waters possessed, to allow a suspect to retire and destroy the evidence of his crime, would ignore that only "unreasonable" searches and seizures are banned. Cf. United States v. Nicholas, 319 F.2d 697 (2 Cir.), cert. denied, 375 U.S. 933, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963).

■ The opinion of the panel mentions that Soyka's was not a street arrest. We take it that these references were intended only to aid in the distinction of Draper v. United States, 358 U. S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and similar cases where the information was that a suspect would commit a crime in a public place where in fact he later appeared. Although we agree that *Draper* is distinguishable, the Supreme Court has never declared that only the *Draper* syndrome constitutes probable cause. While the use of force to enter private premises in order to make an arrest may entail added requirements, see ALI, A Model Code of Pre-Arraignment Procedure, § 3.06 and commentary pp. 121–29 (Tent. Draft No. 1, 1966), the standard of reasonable cause is the same for all felony arrests regardless of their location. It has not been contended that Waters broke into Apartment 5A; apparently he succeeded in placing Soyka under restraint before the latter had closed the door. In any event a breaking would have been justified to prevent almost certain destruction of the narcotics before a warrant could have been obtained. Id. § 3.06(2) (c).

Affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. For the reasons stated in the panel opinion I would hold that the standards set by Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) were not met here. Details given by an informer which are not related to the narcotic traffic furnish little support for an arrest, and details unverified at the time of arrest, such as the window bars and the dog in this case can likewise be given no weight in determining probable cause at the time of arrest. I would not sanction relaxation of the standards of *Aguilar,* particularly in a case such as this, where the identity of the informer is unknown even to the officers, the source of his information is not stated, and the arrest is used to justify the warrantless search of a dwelling.

WATERMAN, Circuit Judge (dissenting):

I dissent from the majority opinion and concur in Judge Smith's dissenting opinion.