**UNITED STATES of America**

v.

**Bernard Del PORTE and Pierre St. Jean, Defendants.**

No. 72 Cr. 867.

United States District Court,
S. D. New York.

March 1, 1973.

Stuart Holtzman, Fed. Defender Services Unit, New York City, for defendant Del Porte.

Robert Blossner, New York City, for defendant St. Jean.

Whitney North Seymour, Jr., U. S. Atty., by Carter La Prade, Asst. U. S.

Atty., New York City, for United States of America.

## MEMORANDUM OPINION

PIERCE, District Judge.

Defendants Del Porte and St. Jean were arrested in Manhattan on July 17, 1972, following their negotiations with a person, later revealed as an informant for the New York Joint Task Force, for about ½ kilo of cocaine. Each defendant was charged in a one-count indictment with possession of cocaine with the intent to distribute it, a violation of Title 21, United States Code, Section 841. Each defendant made incriminating statements within three hours after the arrest.

The proceedings began with a hearing pursuant to identical motions on behalf of each defendant to suppress tangible evidence (355.6 grams of cocaine) seized at the time of their arrests, and the post-arrest confessions of each on the ground that they were tainted products of the alleged unlawful search and seizure of the cocaine. As the hearing commenced, counsel sought to broaden the hearing issues to include voluntariness of the confessions. All parties agreed to expand the hearing to encompass that issue, which the Court was bound to decide, in any event, pursuant to 18 U.S.C. § 3501.

Thus, there were three issues before the Court in the suppression hearing:

A. Was the warrantless search and seizure of the cocaine lawful?

B. If the search and seizure was not lawful, were the post-arrest statements tainted by it?

C. Were the post-arrest statements knowingly and voluntarily made?

Three local police officers, each a member of the New York Joint Task Force, testified at the suppression hearing. Each of the three participated in the surveillance and arrest of the defendants and each testified as to his individual role in other issues raised at the hearing. Investigator Michiel Glick of the New York State Police told of his role as chief contact with the informant who developed the case. New York City Patrolman Daniel Mullen testified as to the circumstances surrounding the taking of defendant St. Jean's written confession. And New York City Patrolman John Flood testified as to the circumstances surrounding both St. Jean's confession and the oral confession of defendant Del Porte.

Following testimony of these officers, and the testimony of defendant St. Jean on the issue of voluntariness, this Court denied each motion to suppress.

Thereafter, both defendants indicated a desire to be tried by the Court without a jury and in open Court each waived his right to trial by jury. Then, by stipulation, the proceeding was deemed a trial; testimony taken at the suppression hearing, which could have been admissible at a trial, was extrapolated into the trial; and, after several stipulations as to chain of custody, the cocaine and confessions were received into evidence. At that time, each defense counsel renewed his motions to suppress and again this Court denied each. Thereafter, the government called the informant Louis Oliveras, and then rested. Once again defense counsel renewed the motions to suppress and again this Court denied each. No evidence was offered by defendants, and all parties rested. On November 29, 1972, this Court found the defendants guilty as charged.

Because the defendants indicated an intent to appeal this Court's rulings on the suppression issues, and because of the extended and wide-ranging colloquy which accompanied the rulings on the several occasions when the motions were resurrected and denied, this Court announced that it would file this memorandum opinion setting forth its findings of fact and conclusions of law for the benefit of all parties on appeal.

## A. THE SEARCH AND SEIZURE OF COCAINE

The Court finds the facts as follows: Louis Oliveras, after his arrest in January of 1972 on a drug charge, became an

active informant for the New York Joint Task Force, supervised by his arresting officer, Investigator Michiel Glick. Officer Glick was in close, almost daily contact with Oliveras beginning in February of 1972. The informant's information had resulted in the initiation of three or four cases involving some arrests and the seizure of some narcotics, prior to the events in this case. Officer Glick, who has been on the force for eleven years and who was, at the time of these arrests, responsible for some ten informants, testified that Oliveras had never given him false information and the Court credits his statement to that effect.

On Sunday, July 16, 1972, Oliveras reported to Officer Glick that he had been approached the night before at Yellowfingers (a Manhattan eastside restaurant) by a waiter there with an offer to sell narcotics. Oliveras described the person who made the offer as darkhaired, in his early 20's, with a babyface. (He was later identified as St. Jean, one of the defendants in this case.) He also described negotiations for ½ kilo of cocaine at a price of $12,000. He told Officer Glick that the person who approached him had indicated that he was acting as an intermediary for a third person who had actual possession of the cocaine.

Officer Glick instructed Oliveras to proceed as if to purchase the cocaine from the intermediary and his "connection." Thereafter, on July 17, 1972, Oliveras inadvertently missed his meeting with the two sellers and was again instructed by Officer Glick to try to follow through with the transaction. At that meeting, the Officer and the informant agreed to a plan whereby Oliveras would drive his car by the corner of 96th Street and Park Avenue, with the sellers as passengers, as a prearranged signal to the Joint Task Force that the deal was on. It was also apparently agreed that from that corner, the car would proceed to a grocery store at 1729 Lexington Avenue where Oliveras would pretend to pick up the money for the co-caine. In fact, Oliveras had been given no funds with which to actually purchase the cocaine, and to the Officer's knowledge, Oliveras had no other source for funds. The stop at the grocery store, where Oliveras actually did work, was apparently a ruse to convince the sellers that Oliveras meant business.

At about 3 p. m., on July 17, 1972, the informant's car, with the informant and two passengers—one of whom matched the previously given description of the intermediary—was observed by Officer Flood passing the prearranged corner. The third person was later identified as Del Porte, a defendant in this case. Officer Flood reported by radio to Officer Glick and then proceeded to follow the informant's car to the grocery store, where all three occupants went in and then came out in a few minutes. Officer Flood observed the informant carrying a brown paper bag. He relayed his observations to Officer Glick.

The informant's car, with the three occupants, then proceeded to the vicinity of First Avenue and 78th Street tailed by Officer Flood's car. Officer Glick who was in a separate car, and apparently still in radio contact, proceeded on a parallel course to 79th Street and York Avenue. At First Avenue and 78th Street, Officer Flood saw the third man get out of the car empty-handed and approach a building on East 78th Street between First and York Avenues. The informant and the intermediary proceeded in the informant's car to York Avenue where they parked. Both Officer Flood and Officer Glick, who had parked their cars nearby, observed the two get out of the informant's car and begin to walk back west on 78th Street. Officer Glick confirmed then that the description of the man with the informant matched the description the informant had given earlier of the intermediary.

Officer Flood followed the informant and the intermediary on foot and testified that he observed the third man, whom he had seen in the car earlier,

walking east toward them, and that upon meeting, the informant and the intermediary turned and all three walked east on 78th Street, toward Officer Flood. Officer Flood testified that the informant then made a hand signal, pointing to the package carried by the third person. Officer Glick, who had stayed behind on York Avenue near the cars, did not see this signal, but soon thereafter he did observe the three dealers walking toward York Avenue.

Officer Flood continued west on 78th Street at this time, ran around the block and returned to the cars only after the arrests had occurred. Meantime, as the three dealers entered the informant's car, the informant gave Officer Glick a hand signal, calling in the arresting officers. They did move in and confront all three persons as they sat in the car preparing to leave the scene. The package was seen by Officer Glick on the seat between the third person's knees. From his experience as a narcotics officer, Officer Glick estimated that the package—about the size and shape of a rolled tabloid newspaper—was about the size of a package required to carry ½ kilo of cocaine. The three were arrested and the package was seized. The package was later found to contain 355.6 grams (about ½ kilo) of cocaine.

The question before this Court is whether at the moment of the arrest, Officer Glick and the other arresting officers had probable cause to take both St. Jean and Del Porte into custody; whether at that moment the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendants had committed or were committing a narcotics offense. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

The evidence adduced at the hearing, and later supported in pertinent part by the informant himself when he took the stand, established to the Court's satisfaction that:

1. Officer Glick had reason to believe in the reliability of the informant, based on his past experience and his actual knowledge of the informant's past performance. The informant was reliable, in fact.

2. Officer Glick had reason to believe in the accuracy of the informant's tip with regard to this case, based on the fact that the informant's information was obtained firsthand and reported to the Officer in convincing detail. Furthermore, some of those details were later corroborated by Officer Glick.

Thus, the requirements of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) were met.

As to the first requirement—the reliability, in fact, of the informant—it is true that Officer Glick, at times during his testimony, appeared to be a reluctant or ill-informed witness with respect to details of Oliveras' role in the specific prior cases. However, the Court recognizes that the cases initiated by the informant are still pending adjudication and attributes the Officer's lapses in memory to the conflicting demands of disclosure for the sake of this case versus non-disclosure for the sake of the pending cases. Under the circumstances, Officer Glick revealed enough of the informant's relevant past history to support this branch of the test, when balanced with the evidence as a whole. Cf. United States v. Manning, 448 F.2d 992, 999–1000 (2d Cir. rehearing in banc), cert. denied, 404 U.S. 995, 92 S. Ct. 541, 30 L.Ed.2d 548 (1971).

The second requirement—the Officer's reason to believe in the trustworthiness of the information provided in this case—has been substantially satisfied by the fact that the informant reported from his own first-hand knowledge. He relayed in detail the facts and circumstances underlying his conclusion that St. Jean and a third person were in possession of cocaine and seeking a buyer for it. He told Officer Glick where

and when and how he had been approached personally; he related a description of the intermediary; he described the terms of the bargain and the amount of cocaine involved. In addition, the officers were able to corroborate the intermediary's description and the presence of a third person in the transaction when the informant showed up at the prearranged time and place. Furthermore, the actions of the informant, the intermediary and the third person fitted the scenario earlier projected by the informant. When the informant gave him the signal to arrest the defendants, and Officer Glick saw the package in the possession of the third man, and the package was about the size of ½ kilo of cocaine, there was, in the totality of the circumstances, probable cause upon which to believe that the package contained the bargained-for cocaine and that St. Jean and Del Porte were committing violations of the federal narcotics law in the officers' presence. See United States v. Soyka, 394 F.2d 443 (2d Cir. rehearing in banc 1968), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969). The arrests were therefore justified, as was the seizure of the package in Del Porte's lap, as an incident to a legal arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Exigent circumstances existed which precluded application for a warrant. Not only were the dealers preparing to drive away with the narcotics, see Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), but also the informant's position was about to be dangerously compromised since he had no funds with which to actually purchase the cocaine.

During the extended and intermittent argument concerning these issues, counsel advanced myriad theories in support of their respective contentions. There were two in particular which the Court feels it is necessary to specifically reject.

■ First, the government attempted to argue that the signal given by the informant to Officer Flood as that Officer passed the three dealers who were walking east on 78th Street toward York Avenue, should be a part of the probable cause equation. Officer Flood's own testimony is that after that signal he continued west, circling the block and arriving back at the informant's car on York Avenue after the arrests. He never communicated the fact of that signal to the arresting officers. While hearsay from fellow officers is a valid basis for probable cause, United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L. Ed.2d 684 (1965), and while the Second Circuit seems to have approved cases in other circuits which hold that the collective knowledge of a large police organization can be imputed to an individual arresting officer, see United States v. Canieso, 470 F.2d 1224 n. 7, 1972, that concept would not appear to be applicable when the hearsay is communicated to no one until after the arrests have been made out of the observer's presence.

■ Second, counsel for defendant Del Porte argued that even if there was probable cause to arrest co-defendant St. Jean, there was no basis for an intrusion beyond a stop and frisk with respect to Del Porte. This Court holds that there was probable cause to arrest Del Porte. The informant had said that there was a third man in actual possession of the narcotics; he set up a meeting with the intermediary, the third man and himself. Del Porte was the third man on the scene when and where the officers had probable cause to believe the transaction would take place. He was seen leaving the company of the informant and the intermediary, empty-handed, and seen soon thereafter, having rejoined them, with a package the size of the amount of cocaine involved. The officers had probable cause to believe that Del Porte was the "connection" and was committing a narcotics offense.

Although the Court has found that all the legal bases for probable cause were touched in this case, it is constrained to note that cases such as

this point up a serious problem for law enforcement officers and for the courts. There was nothing sustained, or repetitious, or entirely certain with regard to the underlying facts, circumstances and corroborating details in this case. The sellers were engaged in a single transaction. The factual context was the tense, fleeting few moments of a moderately large scale of narcotics. There was no opportunity for the careful plotting of extended surveillance to corroborate additional details of the informant's report. It is futile, of course, to speculate as to what would have happened to this ½ kilo of cocaine had such precautions been taken, but the necessity for fast action is apparent.

■ Just as apparent, however, is the threat posed to Fourth Amendment rights. Such a case is, in fact, entirely in the hands of the informant. It is he who reports the contact; it is he who participates in the set-up; it is his judgment and his conclusions which bring the officers in for the formality of the arrest.

The quality of the informant in this context is of utmost significance.

Here, as noted above, the testimony of Officer Glick left something to be desired on this point. The Court accepted the Officer's assertion of the informant's reliability mainly because the informant himself took the stand, was available for cross-examination, and was, in the Court's view, a credible witness. Law enforcement agencies would be well-advised in these cases, to direct their testifying officers to be better prepared with dates and circumstances which tend to give more substance to the claim that the informant was reliable in fact.

## B. TAINT FROM SEIZURE OF TANGIBLE EVIDENCE

Since this Court has held that the seizure was legal, the question of taint is without foundation.

## C. VOLUNTARINESS OF CONFESSIONS

The Court's original findings with respect to the § 3501 issues are stated on the record. To reiterate: Defendants were arrested around 3:45 p. m. on July 17, 1972. They were taken from the upper eastside to New York Task Force offices on Varick Street where they were processed and their confessions were taken. They were thereafter transported to the Federal House of Detention for overnight lodging, arriving there at about 9 p. m. They were arraigned around noon the next day, July 18, 1972.

■ Defendant St. Jean is 22 years old. He is apparently educated and intelligent. And, although he says he has never been arrested before, he has not led a sheltered life, working as he has at Yellowfingers and at similar places in New York City and Montreal. The Court finds that he was given an adequate warning of his rights prior to making his confession, and that his waiver was voluntary and knowing. In fact, the defendant when he took the stand in the suppression hearing said that he was warned twice of his rights and that he understood them.

St. Jean's position is that his confession was precipitated by his anxiety to get to his waiter's job at Yellowfingers in time for his 6 p. m. shift. He says that the officers told him that if he made a statement, his job would not be affected. He further asserts that they refused to let him call his employer until after he had made the statement. Also, he says that while apprising him of the drug charge, the officers also indicated that there was a homicide charge against Oliveras in the picture. St. Jean says that faced with this additional involvement about which he knew nothing (and which was an admitted ruse to protect Oliveras) he confessed to the drug charge as the lesser of the evils. He further alleges and it is certainly not contested that the officers were pleasant to him. He asserts that this was a form of trickery.

Defense counsel characterizes these techniques as psychological coercion serious enough to justify a finding of involuntariness. While recognizing that emotional pressures can reach such levels, this Court finds that such was not the case here. These are not the kinds of law enforcement practices prohibited by the various branches of this exclusionary rule.

■ As to defendant Del Porte's oral confession, the Court finds that he was given an adequate warning of his rights and that his waiver was voluntary and knowing. This is supported not only by Officer Flood's testimony that he was able to communicate with the defendant in English, but also by the fact that Flood was actually able to take the defendant's personal history from him in English. This was further confirmed by testimony given by the informant who said that he had dealt with Del Porte in English and had encountered no language barrier.

■ Counsel for the defendants did not argue the 20-some hour delay from arrest to arraignment, but if they had, this Court would have found the delay reasonable. The statements were given between 6 and 7 p. m., within two or three hours of arrest. Thus, the critical period from arrest to statement is short of the limits set forth in 18 U.S.C. § 3501, and the McNabb-Mallory rule, insofar as it may be applicable. Also, it is apparent that much of the time between arrest and arraignment was spent in transit, in booking, in reducing St. Jean's confession to writing and in overnight lodging while the magistrate was unavailable. It is not the lapse of time, but the use of the time . . . which is proscribed by law. United States v. Marrero, 450 F.2d 373, 376 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S. Ct. 991, 30 L.Ed.2d 808 (1972). Each of the uses of time described above are legitimate. See United States v. Lovejoy, 364 F.2d 586, 589 (2d Cir. 1966), cert. denied, 386 U.S. 974, 87 S.Ct. 1168, 18 L.Ed.2d 135 (1967) ; United States v. Curry, 358 F.2d 904, 913 (2d Cir. 1965), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966) ; United States v. Price, 345 F.2d 256, 261–262 (2d Cir.), cert. denied, 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965) ; United States v. Ladson, 294 F.2d 535, 537–538 (2d Cir. 1961), cert. denied, 369 U.S. 824, 82 S. Ct. 840, 7 L.Ed.2d 789 (1962).

## THE CREDIBILITY OF OFFICERS MULLEN & FLOOD

In the course of reviewing the evidence for purposes of this opinion, the Court had the occasion to examine again the handwritten confession of defendant St. Jean. At that time, the Court observed a telltale pressure impression on the face of that document which appeared to have been left by an earlier writing-out of the defendant's confession. The impression was in the handwriting of Officer Mullen.

■ Had Officer Mullen testified when he was on the stand originally that, in fact, he had written out the statement for St. Jean to copy, it would not have been necessarily fatal to the admissibility of the confession. In this Court's view such a technique is no different, in substance, from those instances where the officer listens to the confession, typewrites it out and the defendant thereafter signs it; or when, as with Del Porte's statement in this case, there is no written document. The key is whether or not the officer's rendition accurately reflects the facts as the defendant voluntarily stated them. It would seem, unless the surrounding circumstances are clearly coercive, that where the defendant copies the statement word for word from the officer's version its accuracy and reliability are reinforced.

However Officer Mullen and his fellow Officer Flood did not so testify. In fact, in direct conflict with the defendant who insisted that Officer Mullen wrote out the statement first, both officers categorically denied the prior writing and insisted that the entire confession was in St. Jean's own words, re-

duced to writing only by him. Further each officer categorically denied ever making any notes with regard to St. Jean's confession.

Under the circumstances, the Court was compelled on its own motion to reopen the suppression hearing on the issue of the credibility of both officers, in order to protect the integrity of this Court, and the rights of these defendants, and to give the officers an opportunity to explain what appeared to be a serious breach of duty to this Court under oath.

Such hearing was held on December 5, 1972. Each defense counsel was given a full opportunity to examine both police witnesses, but in the main deferred to the Court's examination of the two officers. The Assistant United States Attorney also attempted to elicit an explanation. Although Officer Mullen readily admitted that the blind impression was in his handwriting, he maintained that it must have been impressed on the document after it was written by the defendant. It was suggested that his unit is particularly casual about its paper work and that most likely he had later used this piece of evidence as a writing pad. It was never explained why or how the officer could have copied the verbatim text of the defendant's confession while he had it covered, using it as a pad.

After both officers had testified, this Court announced that it had decided, without making a specific finding, to disregard the testimony of each officer with respect to the issue raised at the reopened hearing—i. e., the issue of whether the statement had first been written by the officers. Exercising its discretion as the finder of facts, the Court then declared that it would credit the rest of the two officers' testimony and that what remained was sufficient to sustain the Court's original ruling as to the admissibility of the confessions.

It should be noted here, that even if the Court had decided to discredit the entire testimony of each of these offi-

cers, and thereby refused to admit the confessions, the original ruling regarding suppression of tangible evidence would remain undisturbed, as would the finding of guilt as to each defendant. In fact one of the ironies of the testimony of these two officers is that neither added much to the issues in the case. The confessions, although clearly incriminating, are not critical to the Court's finding of guilt; nor does the Court's denial of the motion to suppress the tangible evidence rely upon the testimony of either officer.

## CONCLUSION

Upon the findings of fact and conclusions of law set forth herein, the Court has denied the motions of each defendant to suppress the tangible evidence and the motion of each defendant to suppress his confession.