**UNITED STATES of America,**
**Appellee,**

v.

**Domingo S. CANIESO and Siu Tsien**
**Chou, Appellants.**

No. 262, Docket 72-1789.

United States Court of Appeals,
Second Circuit.

Argued Oct. 13, 1972.

Decided Nov. 22, 1972.

Francis J. Sheerin, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., and L. Kevin Sheridan, Asst. U. S. Atty., of counsel), for appellee.

Mark A. Landsman, Brooklyn, N. Y., for appellant Chou.

William H. Sperling, Kew Gardens, N. Y., (Richard A. Levy, Kew Gardens, N. Y., of counsel), for appellant Canieso.

Before FRIENDLY, Chief Judge, MEDINA and ANDERSON, Circuit Judges.

FRIENDLY, Chief Judge:

Domingo S. Canieso, a Philippine diplomat assigned to that country's embassy in Laos, and Siu Tsien Chou, a Chinese national, appeal from their well-merited conviction of conspiring to import approximately thirty-four pounds of almost pure heroin from Southeast Asia into the United States and related offenses. Both appellants challenge the judge's ruling, at a pretrial suppression hearing, which sustained the validity of their arrests and the consequent seizure of the heroin; Chou raises some additional points.

I.

At the suppression hearing the Government did not offer the testimony of Jack L. Green, a special agent of the Bureau of Narcotics and Dangerous Drugs (BNDD) stationed at Bangkok, Thailand, who was its first witness at the trial and on whose evidence it now relies to establish probable cause. Appellants correctly have not challenged this reliance. It is settled law that the validity of an arrest or search can be supported by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Rent v. United States, 209 F.2d 893, 896 (5 Cir. 1954); United States v. McKinney, 379 F.2d 259, 264 (6 Cir. 1967); Rocha v. United States, 387 F.2d 1019, 1021 (9 Cir. 1967), cert. denied, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); United States v. Pearson, 448 F.2d 1207, 1210 (5 Cir. 1971).

Agent Green received information in Bangkok from a confidential informant to the effect that Canieso and Chou would attempt to smuggle, on November 10, 1971, a large quantity of heroin into the States. As a result, he sent an alert to the BNDD's New York office, bought a ticket on Pan American World Airways flight 001, scheduled to leave for New York via Europe at 1:30 A.M. on November 10, 1971, and went to the Bangkok Airport during the evening of November 9. He observed Canieso and Chou check in some twenty-five minutes apart and go to the debarkation lounge where they sat for almost an hour without exhibiting any sign of recognition. On boarding the Boeing 747, they occu-

pied seats in the same row but at opposite sides of the aircraft; none of the other seats in the row were occupied. Between Bangkok and London, Green saw them look at each other twenty or thirty times, again without sign of recognition. When the plane stopped at London, Canieso stood up, began to leave the airplane, and nodded to Chou, who returned the signal; they went out together but then took separate seats in the transit lounge. On arriving at John F. Kennedy Airport in New York, Canieso maneuvered his way over to Chou's side of the plane and then proceeded beyond the first available exit to another. Chou, who had started in the direction of the first exit, reversed his field and followed Canieso out of the plane.

During the flight, the New York BNDD office received via Washington a teletype which is reproduced in the margin.[1] Obviously this was an amalgam of the information that had triggered Agent Green's activities and his own observations at the Bangkok Airport. On the basis of this and other information,[2] Agent Hanson obtained a warrant authorizing a search of the two blue suitcases described in the teletype. Hanson and a large number of other agents then went to Kennedy Airport. With the aid of the information in the teletype, supplemented by Agent Green's statements to them after his departure from the plane, the agents identified Canieso and Chou as the latter entered the customs area; the two men were

1. Domingo S. Canieso, Phillippine (*sic*) Attache for Administration at Vientiane, Laos, left Bangkok on PA Flight 001 at 11:30 November 10, 1971, booked through to New York. He will be carrying approximately 20 kilograms of heroin in two suitcases. Canieso will be traveling with Chinese suspect named Tu Chou Sieuwieng. Canieso holds Philippine Diplomatic Passport 222 with B–2 visa issued Vientiane. The suitcases are described as follows: tow (*sic*) (2) suitcases, blue plastic, Pioneer brand, made in England, 26″ x 18″ x 7½″. Each suitcase has four small metal casters, a plastic handle and black and wite (*sic*) strip around the long way.

A check with the Department of State reveals that Canieso has no, repeat no, diplomatic standing or accreditation in the United States. Bangkok advises that Tu Chou Sieuwieng may repeat may deplane in Tehran and pick up PA 119 which arrives in New York 7:55 PM 11/10/71. If this occurs, Canieso is expected to continue with suitcases on PA 001 which arrives New York 3:30 P.M. 11/10/71. Canieso has checked the suitcases through to New York and the baggage claim checks he possesses are NY–PAA Claim Check Nos. B–677–298 and B–677–213. Description of subjects is as follows: Domingo S. Canieso, Philippine male, DOC 5/13/14. He possessed Philippine Diplomatic Passport 222. He is 64″ tall. Black greying hair, receding hairline. Brown eyes,

medium to medium heavy build. At time of boarding in Bangkok he was wearing a dark charcoal suit, white shirt, dark tie, tinted glasses. He was carrying a TWA red and white flight bag and 5″ samsonite attache case. He appeared to have a paper of importance in his pocket.

Tu Chou Sieuwieng, Chinese male 52–53 years old, 5′6″ tall heavy build, 160 lbs., distinguished looking. At the time of boarding in Bangkok he was wearing a dark navy suit, white shirt, dark tie. He was carrying an Air Italia green and white flight bag. He is balding with short hair.

Any further information will be transmitted as received.

2. The only additional items of any significance were that the same informant had earlier advised the BNDD agents in Bangkok that Canieso and another Philippine diplomat accredited to the embassy in Laos would in the near future attempt to smuggle a large quantity of heroin into the United States and that the informant had also advised that, in late July or early August, 1971, Canieso or the other diplomat had picked up and transported to the United States twenty to thirty 700 gram bags of heroin. There was no evidence that the latter statement had proved correct, except for confirmation by Government agents that Canieso and the other diplomat were in fact affiliated with the embassy in Laos and had been issued visas permitting them to visit the United States.

close to each other but did not speak. After having cleared customs, Chou, instead of immediately leaving the customs area, went over to the diplomatic desk where Canieso was standing and placed his own suitcase on the ground. When Canieso moved toward the exit from the terminal without his suitcases having been examined, Chou followed closely. Canieso went to a cab-stand, whereas Chou entered a line of passengers queuing up for an airport bus. After Canieso had secured a cab, he walked in Chou's direction and waved for Chou to come over. Chou left the bus line and joined Canieso in his taxi, which was driven by a BNDD agent. Canieso directed the driver to go to the Lexington Hotel in Manhattan. Although the cab broke down enroute, a following cab, driven by a New York State Trooper, took over and completed the journey.

On the travelers' arrival at the hotel, Agent Salvemini, who had been stationed in a car near the airport, Agent Miller, who had supervised the surveillance there, and several others were on hand. Canieso and Chou put their bags down in the outer area of the lobby. Canieso left Chou in charge of the luggage, went to the desk to check in and, after registering, returned with a bellboy. Salvemini and Miller joined the trio in an elevator and followed as they walked along the fourth floor corridor to Room 437. The bellboy put down the bags and unlocked the door of the room. Canieso and Chou then entered the room, followed by the bellboy, who had left one of the blue suitcases in the hall-way. At this point, Salvemini claims that he noticed that two of the three locks on the remaining blue suitcase had opened so as to create an aperture 1″ to 1½″ wide, through which he could see plastic bags containing a white powder. Agent Miller, who was watching the defendants, did not notice this. Salvemini, who had been given discretion concerning how long to postpone an arrest in the hope of finding the distributors, exercised this immediately after Canieso and Chou had entered the room. After completion of the arrests, Salvemini returned to the hall and picked up the partially opened suitcase in order to bring it into the room. As he did this, the third lock sprang open, and when placing the bag on a bed, he observed numerous clear plastic containers packed with white powder.

■ If the judge credited Salvemini's testimony about the opening of the suitcase and his observation of the contents before the arrests, we could speedily affirm. When an experienced narcotics agent has seen a quantity of bags containing white powder in the possession of the suspects, little, if anything, more is needed to show probable cause.[3] Clearly, as will subsequently be shown, more than that little existed here.

■ The difficulty is that we do not know whether the judge accepted the testimony or not. In denying the motion to suppress, he said only that "[t]he Government agents were well within their authority in making the arrest, making the search of the bags."

---

3. In United States v. Moon, 351 F.2d 464 (2 Cir. 1965), cert. denied, 383 U.S. 929, 86 S.Ct. 936, 15 L.Ed.2d 848 (1966), the officers, who had received a tip, saw Moon hand over two bundles of glassine envelopes, filled with a white substance, and observed the recipient flee as they approached. The agents in United States v. Devenere, 332 F.2d 160 (2 Cir. 1964), were found to have had probable cause to arrest when they had overheard a conversation concerning narcotics originating from an apartment and then observed a glassine bag in the room as the apartment door opened. The Ninth Circuit found probable cause for arrest in Redmon v. United States, 355 F.2d 407, 411 (9 Cir. 1966), when agents had seen an individual carrying a rubber contraceptive with white powder and, as they approached, he threw the object over a fence. See also Brady v. United States, 148 F.2d 394 (9 Cir. 1945); cf. Ker v. California, 374 U.S. 23, 36–37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); United States v. Grogan, 293 F.Supp. 45 (M.D. Ala.1968); People v. Butterly, 25 N.Y.2d 159, 303 N.Y.S.2d 57, 250 N.E.2d 340 (1969).

When Canieso's counsel challenged this ruling and remarked it was strange "that the bellhop conveniently left the bags outside, which bags suddenly turned open permitting Agent Salvemini to make his observations on which he based his arrest," the court first asked "[h]e based his arrest on that?" and then immediately went on to say "[w]ell, I find there was plenty of evidence upon which he could have made his arrest otherwise." [4] While we could request a specific finding on this point and would do so if reversal would be required in the absence of the evidence of observation of the powder, we think that, in view of the other facts and circumstances of which the agents were aware, there was probable cause for the arrests.[5]

Appellants' contention to the contrary is bottomed on the claim that the informer's tip did not meet the "two-pronged" test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which invalidated search warrants for failure of the affidavits to show (1) that the informer was in fact a reliable person, and (2) that the underlying circumstances by which he obtained his information were such that it was probably accurate. The record contains no statement about the informer that would pass the first prong, although it is difficult to believe that the Government would make the substantial investment of time and money required for Agent Green's trip unless the agent had reason to believe that the informer knew whereof he spoke. We are not as certain that the second test was not satisfied. It is hard to see how anyone without direct access to one of the defendants could have known that Canieso would be carrying approximately 20 kilograms of heroin in the suitcases and that there was an alternative plan for Chou's transferring to another plane at Teheran, see fn. 1. As we have previously said, courts should not be astute to invalidate arrests because of the absence of such words as "the informer has seen" or "the informer has heard," particularly when the issue is not the sufficiency of an affidavit—where there is some opportunity for including such phrases—but the existence of probable cause. United States v. Soyka, 394 F.2d 443, 453 (2 Cir. 1968) (en banc), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969). Details like the two mentioned above are not the kind of thing that "could easily have been obtained from an offhand remark heard at a neighborhood bar", Spinelli v. United States, supra, 393 U.S. at 417, 89 S.Ct. at 589, as distinguished from something "which in common experience may be recognized as having been obtained in a reliable way . . . ." Id. at 417–418, 89 S.Ct. at 590. See United States v. Acarino, 408 F.2d 512, 514–515 (2 Cir.), cert. denied, 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969). Be that as it may, what we will assume arguendo to be the failure of the tip to pass either prong of the Aguilar-Spinelli test does not remove it altogether from consideration but simply increases the

---

4. The judge observed, correctly enough, that there was nothing strange in a bellboy's leaving bags in a hall while he unlocks a door. But he did not focus on the true element of strangeness, namely, that locks which had survived a journey half way round the world, loading and unloading at an airport, and deposit in and unloading from two taxicabs, should spring open at so opportune a moment. We do not mean by this that the judge would not have been warranted in accepting Salvemini's testimony. A time comes for everything, and Agent Hanson gave some support to Agent Salvemini's testimony by saying that when he wished to close the bag to transport it to the BNDD office, he could not get the locks to work properly.

5. No objections were raised to the scope of the search incident to the arrest. We therefore have no occasion to consider the validity of the search in light of the principles set forth in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969) and Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

quantum of corroborative and other detail necessary to constitute probable cause.

Here the tip was immediately corroborated to some degree by Canieso's and Chou's taking a flight on the precise day that the informer had indicated they would make a smuggling attempt. Further ground for suspicion arose when the two men selected, out of the wealth of possibilities available on a lightly loaded 747, two seats where they could constantly see each other, yet not be in immediate proximity. An additional bit was added by their first sign of recognition at London, immediately followed by dissociation in the transit lounge. A more important indication that they were working together—on something sufficiently important to have brought them half-way round the world—was furnished by their behavior while disembarking from the plane in New York. Still more significant was Chou's waiting for Canieso to leave the customs area when Chou was free to depart; the agents could well have concluded that Chou had some interest in not leaving Canieso in a position where the latter might take off with the bags on his own. While the plausibility of such an inference was somewhat dissipated by the temporary separation of the two men on going outside the terminal, in what later appeared to have been either an error or a further effort to avoid detection, the inference was powerfully reinforced when, after their long effort to avoid close contact, Canieso beckoned Chou to ride with him in the same cab to the same hotel, and the two men ultimately went to the same room. Another indication that the bags contained something valuable was Chou's standing guard while Canieso registered at the hotel.

■ Apart from the tip, the agents thus had ample grounds for thinking that Canieso and Chou were engaged in a plan to bring something of value into the United States; that the something was of a sort whose entry would be feasible only because of the unlikelihood of a customs search of Canieso's suitcases;[6] and that the two men had gone to considerable pains to avoid being seen together *until the bags had passed the point of possible examination by United States customs officials*. The principal ingredient added by the informer's tip was that the something of value was narcotics, rather than such articles as jewels or antique sculpture, the undeclared entry of which would also have been a crime.[7]

■ The most recent Supreme Court decisions, all but the first of which dealt with the adequacy of an affidavit to support a search warrant, frame but do not entirely solve the problem here presented. In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), where probable cause for arrest was found, the informer had previously proved reliable and his tip furnished considerable detail about the physical appearance and movements of an alleged narcotics dealer, although the informant did not disclose how he had come by this information. The informer's predictions were corroborated by developments, as they were here, but there was less, indeed nothing, in the way of behavior

---

6. There was testimony that, while Canieso's bags could be searched since he was not accredited to the United States, it was unusual to do this in the case of holders of diplomatic passports.

7. Whether the arresting officers were aware of all of the attendant facts and circumstances when they entered the hotel room to make the arrests is not entirely clear. However, "[i]n a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest." Williams v. United States, 113 U.S.App.D.C. 371, 308 F.2d 326, 327 (1962); see United States v. Bianco, 189 F.2d 716 (3 Cir. 1951); Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966) (Burger, J.), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967); United States v. Pitt, 382 F.2d 322 (4 Cir. 1967).

that would have been deemed suspicious in the absence of the tip. In Aguilar v. Texas, *supra*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, where the affidavit was held insufficient, nothing was said about previous reliability and no detail was given; there was simply a bald statement that the police had " 'received reliable information from a credible person' " that narcotics were illegally stored at a described premise. *Id.* at 109, 84 S.Ct. at 1511. Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431 (1966), a summary reversal on the authority of *Aguilar,* in fact extended that case to a situation where the police officer had observed some highly suspicious facts. Spinelli v. United States, *supra,* 393 U.S. 410, 89 S.Ct. 584, presented a more complicated pattern. As in *Aguilar,* there was no statement demonstrating previous reliability. However, there was more detail in the *Spinelli* affidavit. It stated that: (1) Spinelli was a known bookmaker; (2) the FBI had been informed by a confidential informant that Spinelli was operating a bookmaking establishment by means of two specific telephone numbers; (3) Spinelli had been observed on numerous occasions entering and leaving a particular apartment building and had once been seen entering a specific apartment in the building; and (4) telephone company records listed the two phone numbers under the name of Grace Hagan, who lived in the apartment Spinelli had been seen entering. The Court recognized that deficiencies in the affidavit with respect to the informer's reliability and knowledge could be cured by other facts and circumstances, see 393 U.S. at 415–416 & 438, 89 S.Ct. 584 (dissenting opinion of Justice Fortas); the debate, settled in the negative, was whether the additional facts and circumstances were sufficient. Finally, in United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), where the affidavit was held sufficient, although without a majority in favor of any clearly defined position, the statement failed the prong of *Aguilar* requiring a showing of the informer's reliability, but the plurality opinion found sufficient corroborative data in the fact that the informer's statement was against his penal interest and in the police's knowledge of Harris' reputation as a bootlegger—a factor held insufficient in *Spinelli,* 393 U.S. at 418–419, 89 S.Ct. 584.

█ The lesson we draw from all this is that *Aguilar* applies with full rigor only when the search warrant or the arrest depends solely on the informer's tip. When a tip not meeting the *Aguilar* test has generated police investigation and this has developed significant corroboration or other *"probative indications of criminal activity* along the lines suggested by the informant," see Rebell, The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards, 81 Yale L.J. 703, 715–17 (1972), the tip, even though not qualifying under *Aguilar,* may be used to give such additional color as is needed to elevate the information acquired by police observation above the floor required for probable cause. See also Note, The Informer's Tip as Probable Cause for Search or Arrest, 54 Cornell L.Rev. 958, 967 (1969). This was the tenor of our opinion in United States v. Manning, 448 F.2d 992, 997 (2 Cir.), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), although decision there was eased by the agents' having heard running, scuffling and hurried conversations before the arrest. See also United States v. Acarino, *supra,* 408 F.2d at 515. This reading of the cases should not be regarded as a weakening of the protection afforded by the Fourth Amendment; on the contrary, the observation of acts as suspicious as those in this case affords a basis for probable cause far more solid than a routine recitation meeting the tests of *Aguilar.* Cf. Rebell, *supra,* 81 Yale L.J. at 715–17; Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 181 (1969); Comment, 45 N.Y.U.L.Rev. 908, 916 (1970).

## II.

Chou claims that a letter taken from Canieso's person was erroneously admitted against him under the hearsay rule and that, without this, the evidence was insufficient to convict him. Since we reject the first contention, we need not consider the second.

██ Chou's argument must be weighed against some facts not yet stated. Two letters, written in Chinese, were found in Chou's pockets.[8] One letter, not dated or signed, instructed that on reaching New York, the recipient should "go outside the airport and wait for him. And then take a car together and go to the hotel. And live in the same room." The letter also instructed the party to "tell him to cable me. He has the cable number." The recipient was also told whom to contact in New York, to be sure to take the address of the hotel if he went out so that he would not get lost, and to remit the money soon in a way that was described. The second letter, dated November 1, related that the writer had already established contact about "the textile goods," sought to clarify "the basic price of 6,000," and contained other language which the jury could have found to constitute a veiled reference to narcotics. *Cf.* United States v. Desist, 384 F.2d 889, 894 (2 Cir. 1967), aff'd, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

The letter, not signed or dated and in rather garbled English, which was found in Canieso's wallet, dovetailed with the first of the letters on Chou's person just described. It instructed that "[a]fter arriving New York, everything is all right, my relatives will wait for you outside of the air-port. You can get a taxi with him together and then go to the hotel. You can stay with him together." It asked that, immediately upon arrival at the hotel, the recipient should cable an address in Bangkok giving the name of the hotel, the number of the room, and the telephone number. It reminded him that "the man follow you he cannot speak English," that the recipient should "[k]indly take care of him," that the man would "go to find his friend immediately," and that the man should be reminded to take "the card of the hotel" on going out so that he could instruct the taxidriver where to return.

██ We have some doubt whether the Canieso letter is within the ban of the hearsay rule at all. It made no assertion about what the defendants had done; rather it told what they were to do. Its relevancy as against Chou was as circumstantial proof that he was linked with Canieso, the carrier of the narcotics, in much the same way as their common possession of cards giving the Bangkok cable address and the names of the prospective New York contacts would have done. The only way in which the letter can be deemed hearsay is by inserting in it a statement that the writer had entrusted Chou with the task of making the needed contacts in New York. We see no particular reason for doing this simply to create a hearsay problem that would not otherwise exist —even though the jury would doubtless draw exactly this inference. Here the resemblance of the letter found in Canieso's wallet to the one found on Chou's person affords a considerably stronger basis for a conclusion that the Canieso letter was receivable "*circumstantially,* as giving rise to indirect inferences, but not as assertions to prove the matter asserted," 6 Wigmore, Evidence § 1766, at 180 (3d ed. 1940), then the utterance considered in United States v. Bennett, 409 F.2d 888, 895 n.6 (2 Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969).

██ If we thought otherwise, the letter would still be admissible. The sim-

---

8. No objection was made that these constituted inadmissible hearsay, and there would have been no basis for it. Even if the letters constituted hearsay, they were receivable as adopted admissions. See United States v. Bennett, *infra,* 409 F.2d at 898.

ilarity between the letters found on the two defendants and the action they had taken to carry out their instructions, afforded ample basis for finding that the author of the Canieso letter was a member, indeed the leader, of a conspiracy in which Chou was a participant. Since there was thus sufficient evidence, independent of the truth of the Canieso letter alone, to prove Chou's participation in the conspiracy, the letter, even if hearsay, would have been properly admitted as the declaration of a co-conspirator.

Chou's claim that he could not lawfully be convicted of possession of the heroin is frivolous. There was sufficient evidence that he shared control with Canieso—indeed that he was really in charge and that Canieso's main role was to utilize his diplomatic status to be a courier. In addition, Chou could properly be held as an aider or abettor. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949).

The judgments of conviction are affirmed.