**UNITED STATES of America**

v.

**HO YEE BON, Defendant.**

**No. 73 Cr. 947.**

United States District Court,
S. D. New York.

June 27, 1974.

---

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, for the United States; Richard J. Hoskins, Asst. U. S. Atty., of counsel.

Gilbert S. Rosenthal, New York City, for defendant.

## OPINION

COOPER, District Judge.

Defendant Ho Yee Bon was indicted on October 9, 1973 on one count of unlawful possession of opium in violation of 21 U.S.C. § 844. Pursuant to Fed.R. Crim.P. 41 he moved for an order (1) suppressing the opium on the ground that it was illegally seized, and (2) suppressing certain statements made by him on the ground that he was never advised of his constitutional rights and never knowingly waived them. Defendant's motion to suppress physical evidence was denied in our memorandum opinion of January 8, 1974. On that same date, we ordered an evidentiary hearing on the second motion to resolve certain factual issues relating thereto. On January 14, 1974 defendant moved that we reconsider our memorandum decision of January 8, and extend the scope of the evidentiary hearing to consider the issue of the physical evidence as well. On January 15 and 16 and February 26, 1974, a full evidentiary hearing was conducted into both the seizure of the physical evidence as well as the making of the oral statements. For the reasons set forth below we (1) affirm our decision of January 8, 1974, denying defendant's motion to suppress the tangible evidence, and (2) deny defendant's motion to suppress his oral statements on the grounds that he was given his

*Miranda*[1] rights at the time of his arrest and that he knowingly and intelligently waived them at that time.

## I. MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant was arrested in Pennsylvania Station, New York City on July 31, 1973 by agents of the Drug Enforcement Administration (hereinafter DEA). The arrest was prompted by an anonymous telephone call received the previous day at about 1:00 or 1:30 p. m. by Agent Murphy of the DEA. The caller told Murphy that (1) on the following day (July 31, 1973) (2) a Chinese male by the name of Ho Yee Bon, (3) would be leaving from Pennsylvania Station, (4) at approximately nine o'clock in the morning, (5) bound for Chester, Pennsylvania; that (6) defendant worked at the China Garden Restaurant on West 3d Street in Chester. He described Ho Yee Bon as (7) having a G.I. haircut and wearing (8) a brown suit with (9) a white shirt. Murphy was told that defendant (10) had been arrested previously on drug charges and had spent or been sentenced to five years in jail. The caller said that Ho Yee Bon was (11) an illegal alien, but that (12) he had a "green card."[2] Finally, the caller said that (13) Ho Yee Bon would be carrying "dope." (Tr. 171–73)[3]

DEA agents then secured a photograph of Ho Yee Bon from their files, and Agent Murphy verified that there was a restaurant, the China Garden Restaurant, on West 3d Street in Chester, Pennsylvania, and that Ho Yee Bon had been arrested previously on a narcotics charge and had been sentenced to five years. (Tr. 173–74) The Immigration and Naturalization Service (INS) was

contacted that night and at about 7:00 a. m. on July 31, agents from INS and DEA met in Pennsylvania Station and set up surveillance points. (Tr. 20)

INS agents first saw defendant as he was descending an escalator near the Amtrak ticket sales windows. They followed him onto the train platform and identified themselves. Defendant, who was carrying a shopping bag, was asked if he had a "green card" and he produced an order of supervision.[4] The agents asked Ho Yee Bon to accompany them to a telephone booth in the waiting room, where one of the agents called his office to check on defendant's immigration status and learned that a warrant of deportation had been issued in 1965 but that it could not be executed because travel documents were not obtainable. It was for this reason defendant was under an order of supervision. The INS agents then told the DEA agents that they were satisfied as to defendant's status and were not going to detain him further. (Tr. 20–44) At this point the DEA agents approached defendant and Agent Moriarty, having identified himself, read to defendant his constitutional rights. (Tr. 49–51) Although Ho Yee Bon was not formally told that he was under arrest until sometime later, Moriarty admitted that defendant was under arrest from this point on. (Tr. 82)

Moriarty patted defendant down and examined the contents of the shopping bag but found no contraband. He then took defendant into the Pennsylvania Railroad Police office and searched more thoroughly. The shopping bag contained a plastic bag of lichee nuts in the center of which he found a small package containing a substance later determined to be approximately 7.69 grams of opium. (Tr. 53–55, 79–82)

---

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. A "green card" is a card issued to an alien signifying his lawful residence in the United States. Fuller explanation is on p. 585.

3. The notation "Tr." followed by a number refers to the minutes of the evidentiary

hearing held on January 15 and 16, and February 26, 1974.

4. An order of supervision is a document permitting an alien who has been ordered deported to remain. Fuller explanation is on p. 585.

Defendant vigorously attacks the legality of his arrest and contends that the agents lacked probable cause to proceed as they did. His argument is essentially as follows: (1) the informant's tip was proven false or mistaken in two material respects when the INS agents determined that defendant was lawfully in this country and not an "illegal alien" and that the defendant had an order of supervision and not a "green card;" (2) the informant was totally anonymous to Agent Murphy and had no record of proven reliability; (3) the informant did not state the basis for his information; (4) at no time was defendant's conduct in any way suggestive of criminal activity. For these reasons defendant argues that the tip was too weak to support a finding of probable cause; that his arrest, and the search incident thereto, must therefore be declared illegal.

We disagree. First, defendant is mistaken in his claim that the tip was proven false or mistaken in any material respect; in fact, these elements were fully corroborated prior to the arrest. Secondly, although the other characterizations of the tip are accurate, as conceded by the Government, nevertheless, the extraordinary detail of the tip and the fact that it was fully corroborated in each and every respect compel the conclusion that the agents had probable cause to make the arrest.

The dispute over whether the informant was right or wrong concerning defendant's immigration status arises from a likely confusion over the meaning of the terms "illegal alien" and "green card." A warrant of deportation is the result of a finding by an INS judge that an alien has been found deportable and has been ordered deported from the United States. (Tr. 28) Such a warrant had been issued against defendant in 1965 following his narcotics conviction. (Tr. 22–24, 28–29) Subsequent to an order of deportation, however, travel documents must be obtained for the removal of an alien from the United States. In the case of defendant,

no such travel documents were obtainable because he was considered a refugee directly from Mainland China. Under these circumstances, INS issued its order of supervision. This is a temporary and revocable document permitting an alien to remain at large subject to certain conditions, among them, that he produce himself for deportation at the time and place designated, that he not travel outside the New York district for more than 48 hours without first notifying his deportation officer, and that he report in person to his deportation officer every January. (Tr. 28–29, 32–36)

Technically, a "green card" is a wallet-size green card issued to an alien by INS signifying that the holder is a lawful, permanent resident of the United States. (Tr. 43) The term has a broader meaning, however; it has become the universal expression among aliens for that document—regardless of technical name or color—which signifies that the bearer is lawfully present in the United States, either permanently or temporarily. (Tr. 37, 42) This explains why defendant, when asked for his "green card," immediately produced the order of supervision.

Defendant contends that the tip was wrong in that he was not an "illegal alien" because he is lawfully in this country, and that he did not possess a "green card," but rather an order of supervision. This requires, however, an unrealistically precise interpretation of defendant's immigration status. Defendant was an "illegal alien" because a warrant of deportation had been issued against him in 1965 ordering him deported from the United States. This warrant is still outstanding and fully valid; it was, in effect, stayed by the subsequent issuance of the order of supervision. (Tr. 22–24, 28–29) The term "illegal alien" is a common, succinct expression for an alien against whom a warrant of deportation has been issued; it is used not only by laymen, such as the informant, but by professionals as well. (Tr. 105) Similarly, an order of supervision is not a "green card" in the technical sense of

the word; nevertheless, in the broader sense, it was defendant's equivalent to a "green card" in that it was evidence of his lawful presence in this country. (Tr. 37, 42) For these reasons defendant errs when he asserts that the tip was proven materially false; in fact, just the opposite is true. The informant was quite correct in his seemingly contradictory statements that defendant was both an "illegal alien" and the holder of a "green card."

Defendant argues further that the informant's tip, even if entirely true, is so inherently weak that the arresting officers lacked probable cause. He points out that no case cited by the Government contains all three of the deficiencies inherent in the instant tip: an informant of unproven reliability, no basis alleged for the information, and no evidence of guilt by suspicious behavior. In particular, he argues that United States v. Manning, 448 F.2d 992 (2d Cir.) (en banc), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), upon which we relied in our memorandum opinion of January 8, 1974, is distinguishable from the present case because there the informant had seen the narcotics himself, and because, when the federal agents identified themselves at the door, they heard running and scuffling within the apartment characteristic of efforts to dispose of narcotics and escape. It is true that no case cited by either the Government or the defendant is the precise factual analogue of this case. Nevertheless, we are persuaded that the case law, including *Manning*, supports our finding of probable cause.

■ To support a search and seizure as properly incident to a warrantless arrest, the arrest itself must be shown to have been lawful. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). DEA agents have been given statutory authority to "make arrests without warrant . . . (B) for any felony, cognizable under the laws of the United States, if [they have] probable cause to believe that the person to be arrested has committed or is committing a felony." 21 U.S.C. § 878(3). The ultimate issue, then, is whether the agents had probable cause to make the arrest.

■ All are agreed that the starting point for the law in this area is Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[5] Under *Aguilar* probable cause for a warrantless arrest is established if the informant's tip meets two requirements: (1) "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were" must be disclosed, and (2) the informant must be shown to have been reliable. 378 U.S. at 114, 84 S.Ct. at 1514. This test was developed further in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). There the affiant swore that his informant was reliable, but gave the magistrate no grounds to support this conclusion. Even more important the Court said, was that the tip did "not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation . . . In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." 393 U.S. at 416, 89 S.Ct. at 589. In United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), the Court was faced with the issue of an infor-

5. The grounds for establishing probable cause for an arrest without a warrant are basically similar to those required for the issuance of a warrant. Spinelli v. United States, 393 U.S. 410, 417 n. 5, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). For this reason *Aguilar, Spinelli*, and other cases which involve the sufficiency of an affidavit for a search warrant are relevant.

mant whose tip was based on personal observation, but whose reliability was unproven. The precedential value of *Harris* is difficult to determine—the five member majority wrote four opinions—but this much is clear: the judgment of the Sixth Circuit, rejecting the affidavit as insufficient because no information was presented to enable the magistrate to evaluate the informant's reliability, was reversed.

The post-*Aguilar* decisions are numerous and varied. Our disposition of this motion is guided in particular by United States v. Manning, *supra,* and United States v. Canieso, 470 F.2d 1224 (2d Cir. 1972). In *Manning* a previously unknown informant told federal agents that Manning was engaged in the distribution of heroin and cocaine. He told them further that Manning had a prior federal narcotics conviction, and supplied them with Manning's address, the make and license number of his car, and the address of Manning's girl friend, Audrey, whose apartment Manning was allegedly using as his base of operations. The agent confirmed Manning's ownership of the car, observed the car at both Manning's and Audrey's addresses, and confirmed that Manning had not one but three prior narcotics convictions. The informant also identified Manning's picture. Several days later the informant called and said that Manning was on his way to Audrey's apartment with narcotics. On that same day, after the agents had gone to Audrey's apartment and observed Manning's car parked outside, the informant called again to say that he had seen the drugs in the apartment. The agents then went to the apartment door, announced their identity, heard running from within, broke the door down, and made the arrests.

Upon rehearing *en banc,* the Second Circuit held that there was probable cause for the arrests and affirmed the convictions. Judge Friendly, writing for the Court, noted that the reliability of an informant need not be established where his information has been corroborated in detail: "As earlier indicated, we believe also that the opinion [of the panel majority] attached too much weight to the lack of a previous record of accurate information by the informer. This belief derives strong additional support from United States v. Harris, *supra,* which the panel did not have available to it. Such a record is indeed vital when the informer makes only a 'meager report' that 'could easily have been obtained from an offhand remark heard at a neighborhood bar,' Spinelli v. United States, 393 U.S. 410, 417, 89 S. Ct. 584, 589, 21 L.Ed.2d 637 . . . (1969), rather than one 'which in common experience may be recognized as having been obtained in a reliable way.' *Id.* at 417–418 . . . ." 448 F.2d at 999.

It is true that, as defendant herein argues, the defendants in *Manning* evidenced their guilt by running and scuffling when the agents identified themselves at the door. Judge Friendly did rely on that activity as additional support for the arrest, but he specifically pointed out that, even before the agents identified themselves, "[b]y this stage a great deal had occurred to confirm the informant's reliability, and it is strongly arguable that, under the Supreme Court's recent decision in United States v. Harris . . . , probable cause may have existed . . . ." 448 F.2d at 998. That defendant here did not evidence his guilt at the time of arrest did not add to the probable cause which already existed, but neither did it subtract from it.

The other distinction claimed by defendant from *Manning* is that there the informant's tip was based upon personal observation and knowledge. This argument was made in United States v. Canieso, *supra.* There a federal narcotics agent stationed in Bangkok, Thailand, received information that Canieso and a co-defendant, Chou, would attempt to smuggle about 20 kilograms of heroin in two suitcases into the U. S. from Bangkok. The tip included information on specific flights on which the men would be travelling, including an alternative

plan for Chou's transferring to another plane at Teheran. The agent bought a ticket on the same flight and noticed that defendants had carefully selected two seats where they could constantly see each other yet not be in immediate proximity. After similar behavior throughout the flight and while awaiting customs clearance in New York, the defendants ultimately rode together in the same cab to the same hotel where they went to the same room. They were arrested immediately after entering the room.

Defendants contended that the informant had not provided any of the underlying circumstances by which he had obtained his information. The Second Circuit, again through Judge Friendly, rejected this: "[C]ourts should not be astute to invalidate arrests because of the absence of such words as 'the informer has seen' or 'the informer has heard,' particularly when the issue is not the sufficiency of an affidavit—where there is some opportunity for including such phrases—but the existence of probable cause." 470 F.2d at 1229.[6]

The Supreme Court has cautioned us to avoid insistence on hypertechnicalities. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). "If the teaching of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted . . . in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

In *Canieso* it was also argued, as here, that there was no showing that the informant was reliable. The Court said, however, that "what we will assume *arguendo* to be the failure of the tip to pass either prong of the *Aguilar-Spinelli* test does not remove it altogether from consideration but simply increases the quantum of corroborative and other detail necessary to constitute probable cause." 470 F.2d at 1229–1230. The Court went on to say that *Aguilar* applies with full rigor only when the arrest depends *solely* on the informant's tip. Where police investigation has developed significant corroboration, the tip, though of itself insufficient under *Aguilar*, nevertheless when considered together with the information acquired by police observation, may constitute probable cause. 470 F.2d at 1231.

In the instant case every detail of the tip was corroborated prior to defendant's arrest except one—his possession of the "dope." This corroboration occurred for the reasons that prior to arrival at Penn Station: 1. Agents obtained from their files a photograph of Ho Yee Bon, who fit the description of the person described by the informant. (Tr. 173–75) 2. Agents verified that there was a China Garden Restaurant on West 3d Street in Chester, Pennsylvania. (Tr. 173) 3. Agents verified that Ho Yee Bon had been convicted on a narcotics charge and was sentenced to five years in jail. (Tr. 173) At Penn Station: 4. Agents observed a man matching the description of Ho Yee Bon in Penn Station at the time and on the day reported by the informant. (Tr. 37, 45–49, 68) 5. Prior to the arrest this man's identity as Ho Yee Bon was established by INS agents. (Tr. 22–25) 6.

---

6. *See* Rebell, The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards, 81 Yale L.J. 703, 705 n. 16 (1972): "The acceptable statement 'x is selling liquor to me' and the unacceptable statement 'x is selling liquor' may seem equivalent in the minds of the informant or the officers drafting the warrant application."

Prior to the arrest agents were told that Ho Yee Bon was in fact on his way by train to Chester, Pennsylvania and to the China Garden Restaurant there. (Tr. 25–26) 7. Prior to the arrest agents received confirmation that a warrant of deportation had been issued against Ho Yee Bon, but that an order of supervision was also in effect, thus verifying the informant's report both that defendant was an "illegal alien" and that he had a "green card." (Tr. 22–29, 37, 42)

In addition to the extraordinary detail of the information and the manner in which every item was corroborated prior to defendant's arrest, we point out as relevant defendant's prior conviction on a narcotics charge. In *Manning* the Court relied in part on the independent evidence of Manning's prior dealings in narcotics. 448 F.2d at 1000. We regard quite pertinent Justice Frankfurter's comment in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960): "that petitioner was a known user of narcotics made the charge against him much less subject to skepticism than would be such a charge against one without such a history." 362 U.S. at 271, 80 S.Ct. at 736. In United States v. Harris, *supra*, the Supreme Court, in the opinion by Chief Justice Burger, was explicit in stating that a suspect's reputation may properly be relied upon in assessing the reliability of an informant's tip. 403 U.S. 582–583, 91 S.Ct. 2075. *See* Raffone v. Adams, 468 F.2d 860, 865–866 n. 9 (2d Cir. 1972); United States v. Jones, 359 F. Supp. 1268, 1275 (D.Md.1973). In the instant case more than mere "reputation" was involved; before they arrived at Penn Station the agents had confirmed that Ho Yee Bon had previously been convicted on a narcotics charge. (Tr. 173)

Finally, in Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967), Judge, now Chief Justice, Burger stated, "As we have often observed, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total." 358 F.2d at 837. This principle has been expressed time and again in this Circuit. "Counsel ought to understand the futility of tedious efforts to show that each piece of testimony is susceptible of an innocent interpretation if it stood alone. The trier is entitled, in fact bound, to consider the evidence as a whole; and, in law as in life, the effect of this generally is much greater than of the sum of the parts." United States v. Bottone, 365 F.2d 389, 392 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966). Referring specifically to what was said in *Bottone, supra*, the Court of Appeals has said that "the principle applies with special force to an officer's on-the-spot determination of probable cause." United States v. Manning, *supra* at 999. See United States v. Soyka, 394 F.2d 443, 454 (2d Cir. 1968) (en banc), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969); Raffone v. Adams, *supra* at 866–867.

In our memorandum opinion of January 8, 1974, we held that under the facts and circumstances present here, the agents had probable cause to believe that defendant was committing a violation of the laws of the United States relating to narcotics at the time they arrested him. We are convinced that our prior holding was correct and that the physical evidence seized is admissible at trial.

## II. MOTION TO SUPPRESS ORAL STATEMENTS

Defendant moves further to suppress any oral statements or admissions allegedly made by him at the time of, or subsequent to, his arrest. He argues that even if the Court finds that there was probable cause for the arrest any statements made at that time or thereafter must be suppressed on the grounds that he did not understand his constitutional rights and did not knowingly and intelli-

gently waive them. Defendant claims not that he does not understand rudimentary English but that his problem with the English language is sufficient so that he cannot be held to understand the *Miranda* warnings in English. Further, he contends that the testimony of the Chinese interpreter, Mr. Szeto, is "totally unreliable" and that there can be no assurance for the Court that Mr. Szeto ever gave defendant his rights or that defendant understood them. The Government responds that the record could not be clearer that defendant was given his rights four times—twice in English and twice in Chinese—and that he understood those rights each time they were given.

■ We are convinced, and the record of the three-day hearing in this case makes it quite apparent, that defendant heard and understood his constitutional rights perfectly the very first time that they were given. Any statements made by defendant were made by him with full knowledge of his rights and are therefore admissible at trial.

Defendant was first given his rights at Pennsylvania Station when DEA Agent Moriarty first approached him immediately after his release by the INS agents. Moriarty indicated that the warnings were given with gestures, and that the words were spoken slowly and distinctly, as follows:

"A: I identified myself to the defendant as a Special Agent—a Federal Narcotics Agent, specifically. I showed him a pocket commission identifying me as such and a badge identifying me as such and I advised him that I would like to talk to him. I was very insistent upon narcotics; that I was a narcotics agent, and I reminded him, in order to clarify that point, that I was from the same basic agency as he had once had a prior contact with; that I knew him to have prior contact with. He said he understood who I was. Then I told him that I was going to read him his rights—I was going to give him his Constitutional rights, which I proceeded to do.

Q: Would you tell us what you said?

A: I told him that—asked him—I said, 'Do you understand that you have the right to remain silent and that you don't have to tell me anything; you don't have to answer my questions', and he responded orally that he did understand that.

I said, 'Do you understand that anything you do tell me can and probably will be used against you in a court or some other kind of proceeding,' and he responded orally that he did understand that. I further told him that if he wanted to have a lawyer present with him, an attorney, his attorney during any kind of questioning, he was entitled to have that attorney present and I would not ask him any kinds of questions, nor expect any kinds of answers from him before he gave—before that attorney was present. He responded orally that he understood that he could have an attorney present with him and I further advised him that if he didn't have the money to afford an attorney, to get himself a lawyer, that the Government, the Judge, the Magistrate, would appoint a lawyer for him, free of cost, that he wouldn't have to pay any money for the lawyer, and that we would wait until such appointment was done before we could ask him any questions and he responded orally that he did understand that.

I further advised him that if he chose to, he could answer questions without the presence of an attorney, but if at any time during that kind of questioning, if he wanted to stop answering questions, he could stop answering the questions for the purpose of talking to an attorney, obtaining and consulting with one, and he understood that—he responded orally that he did understand those rights." (Tr. 49–51)

As we discussed in Part I of this opinion, after being questioned and cursorily searched in the waiting room of the station, defendant was taken to the Pennsylvania Railroad Police office for a more thorough search. Immediately

upon discovering the opium Moriarty told defendant he was under arrest and again informed him of his rights. This time, however, defendant insisted that he did not understand Moriarty at all. (Tr. 56–59, 82–83) The agents then took defendant to their offices on 57th Street for processing. During the time that defendant was being processed, DEA Agent Murphy contacted an INS Chinese interpreter, Mr. Szeto; Szeto, Murphy, and Ho Yee Bon then had a three-way telephone conversation. (Tr. 88–91) At the outset of this conversation, Mr. Szeto, an INS interpreter for 23 years, identified himself as such to defendant and stated that he was going to act as a translator for the agents who had arrested him, explained that his purpose was to ensure defendant understood what the agents said, asked defendant his name and where he came from, and, finally, whether defendant could understand him. Defendant said that he did. (Tr. 186–87) Mr. Szeto then translated what the agent read to him—the *Miranda* warnings. At the end of each statement of right defendant was asked if he understood; each time responded affirmatively. (Tr. 188–90)

On that same day, July 31, 1973, at about 12:45 p. m., defendant was taken to the office of Assistant United States Attorney Hemley. With defendant and Mr. Hemley were Mr. Szeto and two or three Government agents. For the fourth time in almost as many hours, and for the second time in Chinese, defendant was given his constitutional rights. In Mr. Hemley's office Mr. Szeto twice went through the preliminary of making sure that defendant understood him. (Tr. 191–92) Again Mr. Szeto translated for defendant his constitutional rights, and again defendant said that he understood. The conversation also involved such details as defendant's children, his job, and his previous conviction. (Tr. 10–12, 192–93) Mr. Szeto concluded his direct examination by stating that on no occasion whatsoever, during either the telephone conversa-

tion or the conference in Mr. Hemley's office did defendant indicate by gesture or word, in any language, that he did not understand or experienced difficulty understanding. (Tr. 187–89, 193–94)

In the first place, defendant's attack on Mr. Szeto's credibility is utterly unfounded. The basis for this attack is certain alleged inconsistencies between Mr. Szeto's testimony and that of DEA Agent Murphy and Assistant United States Attorney Hemley. The inconsistency on which defendant relies most heavily involves Murphy's testimony that the telephone conversation was basically two-way (Tr. 90–91) and Szeto's testimony that it was three-way. (Tr. 185–86) This "conflict," however, is really no conflict at all. There is no question but that the telephone conversation involved three parties: Special Agent Murphy, Mr. Szeto, and Mr. Ho Yee Bon. Murphy testified that he himself contacted Szeto, spoke with him, had another agent put defendant on the line and listened to their entire conversation from an extension. (Tr. 89–90) Murphy was asked whether both Mr. Szeto and the defendant were talking, or just one; it was in response to this question that he said that there were two parties talking. (Tr. 90–91) The other alleged inconsistencies are even more trivial and unworthy of discussion. We were consistently impressed with Mr. Szeto's openness and honesty before us; we find it convincing and we reject entirely defendant's contention that his testimony is "totally unreliable." Mr. Szeto spoke with an integrity all too frequently lacking in witnesses before us.

Furthermore, this argument ignores the issue of whether defendant understood the warnings in English. Defendant lived in this country for about 25 years at the time of his arrest, had been convicted previously of a narcotics offense and served a prison term of three and a half years, resided in Long Island City and commuted to the restaurant at which he worked in Chester, Pennsylvania. (Tr. 11–13, 25, 114–15, 121–23) We mention this to underscore defend-

ant's broad opportunity for exposure to English conversation. During the hearing defendant was accompanied by an interpreter, Mrs. Moy; examination of defendant was conducted by translating each question to him into Chinese and each of his answers into English. During cross-examination the Government asked defendant the name of the person who worked at the restaurant in Chester, Pennsylvania, besides himself and the manager. Defendant's pretense of not speaking or understanding English lost all credibility when he said, in perfect English: "I forgot her name" (Tr. 128) At that time we commented on those words as follows: "As the trier of facts I say they were said with alacrity, without hesitation and with a certainty of speed that comes with a fair degree of usage of English. They were not belabored. They were uttered spontaneously and without hesitation." (Tr. 129) We now add (and should have then) defendant spoke those particular words with a smoothness in sharp contrast with his previous demeanor. Most assuredly, he gave himself away; indeed, a solid example of how the truth will out.

Defendant's credibility was further crippled by his testimony concerning Mrs. Moy, the interpreter at the hearing. In the morning session defendant testified that on several occasions prior to the hearing Mrs. Moy had been present during meetings with his attorney and had been used as an interpreter by them. (Tr. 135–38) The first question of the afternoon session concerned this same subject. This time defendant testified he had never seen Mrs. Moy before the beginning of the hearing. (Tr. 142).

We find as a matter of fact, therefore, that defendant's ability to speak and understand English was fully sufficient for him to understand the *Miranda* warnings when they were given to him for the first time in English by Agent Moriarty. Moriarty spoke simply and explicitly and defendant's command of English is quite enough to understand

such careful phrasing. Any statements or admissions by defendant subsequent thereto are therefore admissible at trial.

Accordingly, for the reasons set forth above, defendant's motions to reconsider our determination covered in the memorandum opinion of January 8, 1974 and to suppress any statements or admissions are denied.

So ordered.